# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### WESTERN DIVISION

**JAMES VIRGIL DESHIELDS**                                                     **PLAINTIFF**

**V.**                              **NO. 4:18CV00055-JTR**

**NANCY A. BERRYHILL,**
**Deputy Commissioner for Operations,**
**performing the duties and functions not reserved**
**to the Commissioner of Social Security**                      **DEFENDANT**

## ORDER

### I.   Introduction:

Plaintiff, James Virgil Deshields, applied for disability benefits on July 12, 2015, alleging a disability onset date of April 10, 2014.[1] (Tr. at 19). The claim was denied initially and upon reconsideration. *Id*. After conducting a hearing, the Administrative Law Judge (AALJ@) denied Deshields' claim. (Tr. at 31-32). The Appeals Council denied his request for review. (Tr. at 1). Thus, the ALJ's decision now stands as the final decision of the Commissioner.

For the reasons stated below, the Court[2] reverses the ALJ's decision and remands for further review.

---

[1] Deshields amended his onset date to January 1, 2015. (Tr. at 19).
[2] The parties have consented in writing to the jurisdiction of a United States Magistrate Judge.

## II.  <u>The Commissioner=s Decision</u>:

The ALJ found that Deshields had not engaged in substantial gainful activity since the alleged onset date of January 1, 2015. (Tr. at 21). At Step Two of the five-step analysis, the ALJ found that Deshields has the following severe impairments: left upper extremity dysfunction with nerve palsy, degenerative disc disease, and depression. *Id*.

After finding that Deshields' impairments did not meet or equal a listed impairment (Tr. at 22), the ALJ determined that Deshields had the residual functional capacity ("RFC") to perform work at the light level, except that: (1) he could only occasionally stoop, kneel, crouch, and crawl; (2) he could only use his left upper extremity for assistance but no lifting or moving objects; (3) he could hold paper or money; and (4) he could only perform simple routine tasks with occasional changes in routine settings. (Tr. at 23).

The ALJ found that, based on Deshields' RFC, he was unable to perform past relevant work. (Tr. at 27). However, relying upon the testimony of a Vocational Expert ("VE"), the ALJ determined that, based on Deshields' age, education, work experience and RFC, jobs existed in significant numbers in the national economy that he could perform, including positions such as ticket seller and usher. (Tr. at 28). Thus, the ALJ held that Deshields was not disabled. (Tr. at 29).

## III.   **Discussion**:

### A.   Standard of Review

The Court=s function on review is to determine whether the Commissioner=s decision is supported by substantial evidence on the record as a whole and whether it is based on legal error. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015); *see also* 42 U.S.C. ' 405(g). While Asubstantial evidence@ is that which a reasonable mind might accept as adequate to support a conclusion, Asubstantial evidence on the record as a whole@ requires a court to engage in a more scrutinizing analysis:

> A[O]ur review is more than an examination of the record for the existence of substantial evidence in support of the Commissioner=s decision; we also take into account whatever in the record fairly detracts from that decision.@ Reversal is not warranted, however, Amerely because substantial evidence would have supported an opposite decision.@

*Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005) (citations omitted).

It is not the task of this Court to review the evidence and make an independent decision. Neither is it to reverse the decision of the ALJ because there is evidence in the record which contradicts his findings. The test is whether there is substantial evidence in the record as a whole which supports the decision of the ALJ. *Miller*, 784 F.3d. at 477.

3

B.   Deshields= Arguments on Appeal

Deshields contends that substantial evidence does not support the ALJ=s decision to deny benefits. He argues that the ALJ did not give proper weight to the opinions of his treating physicians. For the reasons explained below, the Court agrees with Deshields.

The impairment that serves as the basis for reversal is Deshields' injured left shoulder. Deshields was involved in a rollover car accident in 2014, but due to limited finances, he did not seek treatment for his shoulder until March of 2015. (Tr. at 46). On March 3, 2015, Deshields was seen in the emergency room for shoulder pain, and he was instructed to see an orthopedic specialist. (Tr. at 385). Deshields established with Lawrence Meyer, M.D., a primary care physician, who noted decreased range of motion in the left shoulder, with tenderness and significant atrophy to the area. (Tr. at 357). An MRI of the left shoulder taken on June 26, 2015 showed:

- extensive avascular necrosis
- full thickness rotator cuff tear with disruption of the tendons with retraction;
- hidden biceps tendon lesion with sublux of the tendon medially abutting the middle glenohumeral ligament;
- muscular atrophy involving cuff musculature and the deltoid musculature;
- relative posterior dislocation; and
- extensive labral tear.

(Tr. at 361). Deshields continued to see Dr. Meyer, who again referenced decreased range of motion, tenderness, weakness, and instability. (Tr. at 356, 486, 497).

On July 14, 2015, Charles Pearce, M.D., of Arkansas Specialty Orthopedics, assessed marked atrophy of the entire deltoid indicative of axillary nerve palsy. (Tr. at 377). Deshields had lateral shoulder numbness, short arc of passive motion, and gross posterior glenohumeral instability. *Id.* An x-ray showed subluxation posteriorly with incongruency and avascular necrosis. *Id*; (Tr. at 365). Dr. Pearce said that there was no surgical option due to nerve damage. (Tr. at 353).

On July 21, 2015, Deshields saw Wallace, M.D. of OrthoArkansas. (Tr. at 405). Deshields reported that anti-inflammatories, Tramadol, injections, lying down, rest, and ice did not help with his pain. *Id.* He said his pain was severe, constant, and throbbing. *Id.* He said that lifting, carrying, pushing, pulling, weightbearing, and exercise exacerbated his symptoms. *Id.* Dr. Wallace found that Deshields had limited range of motion, profound cuff weakness, instability, and altered sensation. (Tr. at 406). Dr. Wallace concluded that the shoulder problem was a "difficult issue." *Id.*

On August 4, 2015, Deshields saw an APRN in Dr. Meyer's office, and told her that Ultram did nothing for pain. (Tr. at 353). The APRN found a full rotator cuff tear. (Tr. at 354). On August 18, 2015, Brent Sprinkle, D.O. did a nerve conduction

study on the shoulder and found severe deltoid weakness and sensory loss (Tr. at 413, 414). On September 25, 2015, Deshields again saw an APRN at Dr. Meyer's clinic, who found decreased range of motion in the left shoulder with abnormal movement in all extremities. (Tr. at 497).

In October 2015, Deshields began treating with a pain management specialist, Neeraj Kumar, M.D. (Tr. at 438). Deshields told Dr. Kumar that Tramadol and Naproxen were not working, and his pain was not alleviated with rest. *Id*. He had difficulty sleeping, restriction on activities, and general frustration due to shoulder pain. *Id*. Deshields said his pain was a 7 out of 10 on average. *Id*. Dr. Kumar found that a Drop-Arm Test, Impingement Test, and Neer Test were all positive for shoulder pain. (Tr. at 440). He found limited abduction, flexion, and extension. *Id*. In November 2015, Dr. Kumar wrote that activity modification, home exercise, and pain medications were not working. (Tr. at 450). Deshields continued to treat with Dr. Kumar through July 2016. (Tr. at 527-543). Kumar routinely noted that treatment of all kinds was not effective. *Id*. A variety of shoulder integrity tests were positive for pain. (Tr. at 528, 531).

Records indicate that Deshields saw Dr. Meyer several times in early 2016. (Tr. at 478-486). He noted shoulder pain and a complete rotator cuff tear. *Id*. On February 3, 2016, Dr. Meyer found weakness, instability, and pain with motion in

the shoulder. (Tr. at 486-487).

On May 3, 2016, Deshields saw Dr. Wallace again. Dr. Wallace reported a "massive unrepairable tear with shoulder instability and axillary nerve injury." (Tr. at 522). He said disability of the left upper extremity would be severe. *Id*. Dr. Wallace said he agreed with Dr. Pearce's assessments. *Id*.

Drs. Meyer, Pearce, and Wallace all gave opinion statements regarding the shoulder injury. On June 24, 2015, Dr. Meyer wrote a letter saying that Deshields had limited range of motion, lifting, and holding on to objects. (Tr. at 366). He said Deshields could not complete community service requiring holding on to a trash truck. *Id*. He added that it was very complicated for him to lift anything with his left arm. *Id*. On August 8, 2015, Dr. Pearce wrote a letter saying that Deshields had permanent axillary nerve palsy with massive irreparable rotator cuff tear. (Tr. at 412). He continued that there were no available treatments and he had significant disability with the left upper extremity. *Id*. He said it was a permanent problem and that he could only do activities with his right arm. *Id.*

On March 7, 2016, Dr. Meyer filled out a checkbox form stating that Deshields would need to be allowed to alternate sitting, standing, and reclining as needed, he would need more than the usual break times, and he agreed with Dr. Pearce's assessment of no use of the left upper extremity. (Tr. at 478). Dr. Meyer said Deshields would miss more than four days of work per month. *Id*. On May 3,

2016, Dr. Wallace filled out the same type of checkbox form, reiterating Dr. Meyer's statements and concurring with Dr. Pearce. (Tr. at 525).

Deshields takes issue with the amount of weight the ALJ gave to these treating physicians' opinions. The ALJ gave Dr. Meyer's opinion partial weight, saying that Deshields said he could perform some activities with his left arm (at the hearing, the only activity Deshields said he could do was hold a wallet or money; he couldn't grip or carry a cup of coffee, and he needed help with personal care.) (Tr. at 26, 57-62). The ALJ also only gave partial weight to Dr. Pearce's opinion because, again, Deshields said he could perform some left-handed activities. And the ALJ gave little weight to the checkbox forms from Dr. Wallace and Dr. Meyer, simply because they were short with little elaboration.

A treating physician's opinion should be granted controlling weight if it is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015). The opinion of a treating physician, however, does not automatically control; nor does it eliminate the need to evaluate the record as a whole. *Id*.

When declining to give a treating source's opinion controlling weight, an ALJ still must consider the opinion. 20 C.F.R. § 416.927(d)(2). Specifically, the ALJ

should consider: 1) the length of the treatment relationship and frequency of examination; 2) the nature and extent of the treatment relationship; 3) the extent of relevant evidence supporting and explaining the opinion; 4) the consistency of the opinion with the record as a whole; 5) whether the treating source is a specialist; and 6) other factors which support or contradict the opinion. 20 C.F.R. §§ 416.927(d)(1)-(6).

All three doctors treated Deshields on numerous occasion. All reviewed objective medical tests which confirmed serious injury. The doctors used words like severe, permanent, massive, irreparable and complicated to described the injury. Two of the doctors were orthopedic specialists. And their opinions echoed the reports of Dr. Kumar, the pain management specialist. Finally, while an ALJ may discount a checkbox opinion when it is unsupported, it is clear that these opinions actually just succinctly summarized the opinions already contained in the treatment records. Just because a doctor avails himself of an efficient means to evaluate an impairment does not render his opinion worthless. These three doctors were in agreement, so their opinions as a whole should have been given more weight.

Furthermore, the ALJ only gave some weight to the opinions of the state-agency medical consultants. Ramona Bates, M.D., assigned a light RFC with limited reaching and handling, and allowed only the use of an assistive device with the left

arm. (Tr. at 76). She noted Deshields had problems using his hands. *Id.* Finally, Dr. Bates limited Deshields to only occasional use of ladders, ropes, and scaffolds. *Id.* David Hicks, M.D., reviewed the record and also assigned a light RFC with the same limitations, but he added that Deshields should never use ladders, ropes, or scaffolds, and should never push or pull with the left arm. (Tr. at 101-103). The ALJ said he gave these opinions some weight, but "further modified them in order to be fully consistent with the treating medical records." (Tr. at 27). The RFC assigned by the ALJ did not include any limitation on the use of ladders, ropes, and scaffolds, in spite of two state-agency opinions so limiting Deshields. The ALJ did not point specifically to evidence that contradicted that particular limitation. The record and opinion evidence certainly supported such limitations. A claimant's RFC represents the most he can do despite the combined effects of all of his credible limitations and must be based on all credible evidence. *McCoy v. Astrue*, 648 F.3d 605, 614 (8th Cir. 2011). In determining the claimant's RFC, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of his impairments. *Ostronski v. Chater*, 94 F.3d 413, 418 (8th Cir. 1996). By giving little or partial weight to all of the medical opinions, including that of his own agency, the ALJ lacked support for his RFC. His "further modification" of the state-agency

opinions is inconsistent with the record as a whole, and not permissible without supporting evidence.

Finally, Deshields tried a number of treatments, including strong pain medications, but he did not experience relief. He consistently complained of pain at appointments and range of motion and palpation tests indicated compromise. Deshields testified that his daily activities were very limited, consistent with the treatment records. It is hard to imagine that a man with such a significant injury could perform the work indicated, especially when light work requires frequent lifting or carrying of objects weighing up to ten pounds. Soc. Sec. Reg. 83-10. The RFC appears to be beyond Deshields' capabilities.

## IV.  <u>Conclusion</u>:

It is not the task of this Court to review the evidence and make an independent decision. Neither is it to reverse the decision of the ALJ because there is evidence in the record which contradicts his findings. The test is whether there is substantial evidence in the record as a whole which supports the decision of the ALJ. Miller, 784 F.3d at 477). The Court has reviewed the entire record, including the briefs, the ALJ's decision, and the transcript of the hearing. The Court finds that the ALJ's decision is not supported by substantial evidence, because the ALJ did not give proper weight to the opinion of Deshields' treating physicians, and the RFC

exceeded Deshields' functional abilities.

IT IS THEREFORE ORDERED that the final decision of the Commissioner is REVERSED and the case is REMANDED for further review.

DATED this 27th day of September, 2018.

_____
UNITED STATES MAGISTRATE JUDGE